## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Sand Spring Capital III, LLC, *et al.*,[1] | Case No. 11-13393 (_) |
| Debtors. | (Joint Administration Requested) |

## DECLARATION OF HOBART G. TRUESDELL IN SUPPORT OF
## CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, HOBART G. TRUESDELL, do hereby declare, under penalty of perjury, that:

## INTRODUCTION

1.      I am a principal of Walker, Truesdell, Roth & Associates ("WTR"), which

serves as agent (the "Agent") for Sand Spring Capital III, LLC, CA Core Fixed Income Fund,

LLC, CA High Yield Fund, LLC, CA Strategic Equity Fund, LLC and Sand Spring Capital III

Master Fund, LLC (collectively, the "Onshore Debtors" and each an "Onshore Debtor").  In my

personal capacity, I serve as a director of CA Core Fixed Income Offshore Fund, Ltd., CA High

Yield Offshore Fund, Ltd., CA Strategic Equity Offshore Fund, Ltd. and Sand Spring Capital III,

Ltd. (collectively, the "Offshore Debtors" and each an "Offshore Debtor").[2]  WTR and I have

held these positions since January, 2011.  In my capacity as a principal of the Agent of the

Onshore Debtors and a director of the Offshore Debtors, I have knowledge of the business,

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number (if applicable), are: CA Core Fixed Income Fund, LLC ("CACFILLC") (7053); CA Core Fixed Income Offshore Fund, Ltd. a/k/a CA Core Fixed Income Fund, Ltd. ("CACFILTD") (N/A); CA High Yield Fund, LLC ("CAHYLLC") (7155); CA High Yield Offshore Fund, Ltd. a/k/a CA High Yield Fund, Ltd. ("CAHYLTD") (N/A); CA Strategic Equity Fund, LLC ("CASELLC") (7141); CA Strategic Equity Offshore Fund, Ltd. ("CASELTD") (N/A); Sand Spring Capital III, LLC ("SSC3LLC") (9691); Sand Spring Capital III, Ltd. ("SSC3LTD") (N/A); and Sand Spring Capital III Master Fund, LLC ("SSC3MF") (4004).  The address for each of the Debtors is 315 Third Street, Baton Rouge, Louisiana 70801.

[2]  The Onshore Debtors and the Offshore Debtors are also referred to herein, collectively, as the "Debtors" or, individually, as a "Debtor."  SSC3LLC, SSC3LTD and SSC3MF are sometimes referred to herein as the "Sand Spring Debtors".  SSC3LLC and SS3LTD invested their assets primarily in SSC3MF, and references to investments by or holdings of the "Debtors" or the "Sand Spring Debtors" shall mean the investments by and holdings of SSC3MF as to SSC3LLC and SSC3LTD.

assets, liabilities and financial affairs of the Debtors.[3]  I make this declaration based on my personal knowledge as an Independent Fiduciary as well as information I have learned from discussions with, and information provided to me by, the Debtors' directors and advisors, as well as Commonwealth Advisors, Inc. ("Commonwealth") and its employees and advisors.  Subject to those qualifications, the information set forth in this declaration is true to the best of my knowledge, information and belief.

2.      In my capacity as an Independent Fiduciary, I am one of the persons responsible for overseeing the Debtors' financial, operational and legal affairs.  In addition, in my capacity as an Independent Fiduciary of each of the Debtors, I have been involved in the Debtors' chapter 11 planning process (the "Chapter 11 Process"), including, *inter alia*, (i) participating in the development, negotiation and implementation of various strategic alternatives for restructuring, (ii) managing the advisors and counsel engaged by the Debtors in connection with the Chapter 11 Process, (iii) supervising the preparation of documentation needed to implement the Chapter 11 Process, (iv) overseeing and approving the solicitation of the Debtors' Joint Prepackaged Plan of Reorganization (the "Plan") and (v) consulting on a regular basis with the Debtors' officers and directors, and Commonwealth and its employers and advisors, with respect to the foregoing.

3.      On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions (the "Petitions") for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), thereby commencing these cases (the "Chapter 11 Cases") in an effort to preserve and maximize the value of their chapter 11 estates.

---

[3]  Mr. Truesdell's role in his capacity as a principal of WTR – which serves as Agent for the Onshore Debtors – and as a director of the Offshore Debtors shall be referred to herein as an "Independent Fiduciary," and, with respect to the Offshore Debtors, Mr. Truesdell and Ms. Roisin Carter, the second independent director of the Offshore Debtors, shall be referred to herein as the "Independent Fiduciaries."

01: 11493813.5                    070177.1001

4.    The Debtors intend to operate their business and to manage their properties as debtors-in-possession under sections 1107(a) and 1108 of the Bankruptcy Code.

5.    I am advised by counsel that this Court has jurisdiction over these Chapter 11 Cases pursuant to 28 U.S.C. §§ 157 and 1334 and venue is proper in the United States Bankruptcy Court for the District of Delaware pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

### A.    Overview of the Debtors

6.    Each of the five Onshore Debtors is a Delaware limited liability company and each of the four Offshore Debtors is a Cayman Island exempted company.  The Debtors were each established in 2005, other than the Sand Spring Debtors which were established in 2007.  The Debtors are investment vehicles that hold securities and other assets for investment purposes for the benefit of their membership interest holders in the case of the Onshore Debtors, and their shareholders in the case of the Offshore Debtors.  For each Onshore Debtor (other than SSC3MF) there is a corresponding Offshore Debtor, and each pair of Onshore and Offshore Debtors were established to pursue substantially identical investment strategies.  The Onshore-Offshore differentiation was necessary to allow non-U.S. based and tax exempt Investors[4] the opportunity to participate in the Debtors' investment strategies and still remain in compliance with certain requirements under the U.S. securities and tax laws regarding investments by non-U.S. based and tax exempt Investors.

7.    Investments in the Debtors were solicited pursuant to Private Placement Memoranda ("PPMs") in compliance with Regulation D under the U.S. Securities Act of 1933, as amended, which were distributed to potential Investors and described, among other things,

---

[4]  "Investor" or "Investors" shall mean, individually and collectively, these parties holding membership interests in the Onshore Debtors and shares in the Offshore Debtors.

01: 11493813.5                                070177.1001

each Debtor's investment objectives, its management, the management and performance fees

charged to Investors, the risks associated with investing in the Debtor and certain other legal,

regulatory and compliance matters. The PPM for each Debtor sets forth the investment

strategies for that Debtor. The investment strategies for each Debtor are generally described as

follows:

| Debtors | Investment Objectives |
|---|---|
| CACFILLC and CACFILTD | The investment objective of the "Fixed Income Debtors" was to provide investors with a return exceeding that of the Lehman Brothers Aggregate Bond Index, a broad-based investment grade bond index. The Fixed Income Debtors sought to achieve that objective primarily through investment in a diversified portfolio of fixed income securities that are primarily investment grade. |
| CAHYLLC and CAHYLTD | The investment objective of the "High Yield Debtors" was to provide investors with a return exceeding that of the Lehman Brothers High Yield Composite Bond Index, a broad-based high yield bond index. The High Yield Debtors sought to achieve that objective by investing in a diversified portfolio of fixed income securities that are primarily non-investment grade. |
| CASELLC and CASELTD | The investment objective of the "Strategic Equity Debtors" was to provide investors with a return exceeding that of the Dow Jones Wilshire 5000 Composite Index, a broad-based equity index. The Strategic Equity Debtors sought to achieve that objective primarily through investment in a diversified portfolio of equity securities. |
| SSC3LLC and SSC3LTD (through SSC3MF) | The investment objective of each of the Sand Spring Debtors was to provide investors with positive absolute returns over the long term by seeking investments in a wide variety of opportunities in distressed and highly leveraged companies. The Sand Spring Debtors sought to achieve that objective primarily through investment in the distressed financial instruments of North American companies and subordinated tranches of asset-backed securitizations. |

4

The first investments in the Debtors were made in early 2006, and, at present, the Debtors have approximately 456 Investors.

8.      A summary of the Debtors' holdings as of September 29, 2011 follows:

| Name of Debtor | Investment as of September 29, 2011[5] | | |
|---|---|---|---|
| | Collybus CDO A2 Notes | Total Assets | Percentage of Investments |
| CA Core Fixed Income, LLC | $32,734,064 | $41,887,300 | 78.15% |
| CA Core Fixed Income Offshore Fund, Ltd. | $5,602,353 | $7,970,515 | 70.29% |
| CA High Yield Fund, LLC | $2,570,583 | $6,167,261 | 41.68% |
| CA High Yield Offshore Fund, Ltd. | $4,775,246 | $11,782,710 | 40.53% |
| CA Strategic Equity Fund, LLC | $1,755,673 | $2,331,817 | 75.29% |
| CA Strategic Equity Offshore Fund, Ltd. | $2,229,150 | $2,707,653 | 82.33% |
| Sand Spring Capital III Master Fund, LLC | $6,745,481 | $8,288,667 | 81.38% |

**B.      Commonwealth Advisors and the Management of the Debtors**

9.      Since the Debtors' formation, their investment strategies and operations have been managed by Commonwealth, which is not a debtor in these Chapter 11 Cases. Commonwealth was established in 1991 and is an investment manager and adviser based in Baton Rouge, Louisiana.  Commonwealth is headed by Walter Morales, its President, Chief Investment Manager and Portfolio Manager, and is staffed by a team of investment professionals.

10.      Commonwealth serves as the managing member of the Onshore Debtors (other than SSC3LLC and SSC3MF) and has authority to implement the Onshore Debtors'

---

[5]  These figures were pulled from Commonwealth's internal Microsoft Access database, which is populated from information retrieved from State Street (defined below) on a daily basis.

investment strategy pursuant to the authority designated to the managing member pursuant to the limited liability company agreements for those Debtors.  Commonwealth serves as the Investment Advisor to the Offshore Debtors (other than SSC3LTD) pursuant to investment advisory agreements entered into by Commonwealth and each of those Debtors.  Mr. Morales is also a director of the Offshore Debtors, along with the two Independent Directors.  Pursuant to the governing documents and investment advisory agreements with Commonwealth, Commonwealth charges each of the Debtors a management fee ranging from .90 to 2.0 percent on assets per annum in exchange for its services.

11.    With respect to the Sand Spring Debtors, Sand Spring Management LLC, which is not a debtor in these Chapter 11 Cases, serves as the managing member for SSC3LLC and SSC3MF, and Mr. Morales and the two Independent Directors serve as the directors of SSC3LTD.  SSC3LLC and SSC3LTD invest solely in SSC3MF, and the investments of SSC3MF are managed by Commonwealth pursuant to an investment advisory agreement.

12.    Under the Debtors' governing documents and investment advisory agreements with Commonwealth (where applicable), Commonwealth has discretion to manage the investment strategy for each of the Debtors.  Additionally, since 2009, each of the Onshore Debtors contracted with State Street Bank and Trust Company ("Bank and Trust") and each of the Offshore Debtors contracted with the State Street Cayman Trust Company, Ltd. ("Cayman Trust" and together with Bank and Trust and their affiliates, "State Street") to provide custodial and administrative services to the Debtors.  In that capacity, State Street manages, among other things, the day-to-day treasury and accounting functions for the Debtors and is responsible for administering certain communications from the Debtors to the Investors.

## C. Recent Litigation

13.     In 2010, certain Investors in the Debtors brought claims against Commonwealth and Cantor, both directly and derivatively on behalf of the Debtors.  On or about September 15, 2010, Joseph Broyles brought a putative class action in the 19th Judicial District Court for the Parish of East Baton Rouge in the state of Louisiana, Suit No: 594747, Section:23 (the "Class Action") against Cantor, Commonwealth, Mr. and Ms. Morales and several of Commonwealth's employees.  On November 3, 2010, Mr. Broyles and two other individual Investors brought an action in the 19th Judicial District Court for the Parish of East Baton Rouge in the State of Louisiana, Suit No:  596445, Section: 22 (the "Derivative Action") against the defendants in the Class Action as well as a number of present and former Cantor employees. CAHYLLC, CAHYLTD, CACFILLC, CACFILTD, CASELLC and CASELTD were named as nominal plaintiffs and derivative defendants in the Derivative Action.  The Class Action and the Derivative Action asserted claims for (1) negligent and/or intentional mismanagement of the investors' investments or the Debtors, (2) negligent and/or intentional misrepresentation, (3) violation of Louisiana Blue Sky law, (4) breach of fiduciary duty, (5) negligent and/or intentional misrepresentation of material fact and omissions of material fact in connection with the sale of securities, (6) breach of contract and (7) violations of Louisiana Civil Code article 2315.  The Class Action and Derivative Action (jointly, the "Louisiana Action") allege hundreds of millions of dollars in damages on behalf of the Investors and/or the Debtors.

14.     In December 2010, the Municipal Employees' Retirement System of Louisiana ("MERS") filed an *ex parte* motion in state court to intervene in the Derivative Action and sought to assert both direct and derivative claims for breach of fiduciary duty, breach of Louisiana blue sky law, rescission, negligent misrepresentation and fraud, relating to

01: 11493813.5                                       070177.1001

CACFILLC, SSC3LLC and CA Recovery Fund, LLC. MERS also alleged that Commonwealth

violated its duties under the Investment Advisors Act of 1940 and the Code of Ethics of

Chartered Financial Analysts, but stated that it was not seeking to assert any claim against

Commonwealth under the Investment Advisors Act or any other federal securities law. Cantor

removed the Louisiana Action to the United States District Court for the Middle District of

Louisiana on December 22, 2010. Broyles filed motions to remand the Louisiana Action back to

Louisiana state court, and those motions were denied. MERS did not file a motion to intervene

in the Louisiana Action after its removal to Federal court.

   15. In November 2010, Cantor brought an action (the "<u>New York Litigation</u>",

and together with the Louisiana Action, the "<u>Collybus Litigation</u>") in the Supreme Court of the

State of New York, County of New York, Index No. 652084/2010, seeking indemnification of its

expenses, including attorneys' fees, incurred in defending the Louisiana Litigation, against

Commonwealth, CACFILTD, CACFILLC, CAHYLLC, CAHYLTD, CASELLC, CASELTD

and SSC3LLC, pursuant to the Cantor Settlement Agreement. When the Cantor Repo was repaid

on or about March 7, 2011, Cantor failed to return to the Debtors approximately $525,000 from

the cash flow from the Collybus CDO on the grounds that Cantor was entitled to apply those

funds against Cantor's indemnification claims against the Debtors under the Cantor Settlement

Agreement. On March 14, 2011, the defendants in the New York Litigation brought

counterclaims against Cantor, alleging that Cantor's retention of the funds constituted (1) a

breach of contract, (2) a breach of the covenant of good faith and fair dealing, (3) unjust

enrichment and (4) conversion. The New York Litigation remains pending.

   16. Commonwealth and Mr. Morales have incurred expenses related to the

Collybus Litigation. Pursuant to the Debtors' LLC Agreements, Articles of Association or

Investment Advisory Agreements, Commonwealth has asserted indemnification claims against the Debtors. The Debtors have not provided Commonwealth (or Mr. Morales) with an advancement related to the Collybus Litigation.

17. Likewise, Cantor has incurred expenses related to the Collybus Litigation. Cantor has asserted indemnification claims against the Debtors related to the Collybus Litigation under the Cantor Settlement Agreement. The Debtors have not provided Cantor with advancement in the Collybus Litigation, but Cantor has retained $525,000 from the cash flow from the Collybus CDO and asserts that it has applied those funds against its indemnification claims arising under the Cantor Settlement Agreement. The Debtors dispute that Cantor was entitled to retain or apply the funds.

**D.      The SEC Investigation**

18. On July 10, 2009, the Securities and Exchange Commission (the "SEC") issued a formal order of private investigation, captioned *In the Matter of Commonwealth Advisors, Inc.* (the "Formal Order"). The Formal Order directs "that a private investigation be made to determine whether any persons or entities have engaged in, or are about to engage in, any of the reported acts or practices [in the Formal Order] or any acts or practices of similar purport or object." According to the Formal Order, the SEC staff is investigating "possible violations" of Section 17(a) of the Securities Act of 1933, Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder and Sections 204, 206(1)-(4) of the Investment Advisers Act and Rules 204-2 and 206(4)-8 thereunder, dating back to at least November 2007.

19. According to the Formal Order, the SEC staff is authorized to investigate whether Commonwealth, its officers, directors, employees, partners, subsidiaries, affiliates and/or other persons or entities: (i) directly or indirectly, may have been or may be, among other

things, making false statements of material fact or failing to disclose material facts concerning, among other things, the asset valuations and returns of Commonwealth's hedge fund clients; (ii) may have been or may be failing to make and keep true, accurate and current books and records as prescribed by the SEC; (iii) directly or indirectly, may have been or may be making false statements of material fact or omitting to state material facts concerning, among other things, the asset valuations and returns of Commonwealth's hedge fund clients and the disclosure of conflicts of interest in connection with transactions between Commonwealth clients; (iv) may have, while acting as investment advisers, directly or indirectly, acting as principal for its own account, knowingly sold any security to, or purchased any security from, a client without disclosing to such client in writing before completion of such transaction the capacity in which it is acting and obtaining the consent of the client to such transaction; and (v) directly or indirectly, may have been or may be making untrue statements of material fact or omitting to state material facts necessary to make the statement, in light of the circumstances under which they were made, not misleading (including with respect to the asset valuations of Commonwealth's hedge fund clients). Commonwealth is cooperating with the investigation.

20. Commonwealth has advised me that the investigation may relate to, among other things, the investment in, and valuation of, the securities issued by the Collybus CDO, and trading of securities (including, but not limited to, the Collybus CDO C and D Notes and equity securities) that were sold from one fund, using a third-party broker, and purchased by another fund (the "Trades")[6] There appears to be some overlap between the conduct involved in the SEC investigation, and the conduct alleged in the Louisiana Litigation.

---

[6] By way of background, in 2008, the funds underwent a restatement of their net asset values. As part of the restatement process, the values of the Collybus C, D, and equity tranches were substantially reduced. Also, as part of the restatement process, certain of the Trades were repriced. However, other of the Trades were not repriced, such as Trades involving funds (which closed in approximately March 2008) and the other Debtors.

**E. The Investigation by the Independent Fiduciaries**

      i.    *The Appointment of the Independent Fiduciaries*

      21.    On January 11, 2011, as amended by a resolution dated February 18, 2011, Commonwealth appointed the Independent Fiduciaries to, *inter alia*, evaluate and advise as to bankruptcy and restructuring matters, as well as to review claims and potential settlements with Cantor and Commonwealth (collectively the "<u>Delegated Matters</u>").  I represent the Agent in its capacity as one of the Independent Fiduciaries.  On January 13, 2011, as amended by a resolution dated February 16, 2011, the boards of the Offshore Debtors appointed me to serve as an independent director on the boards of each of the Offshore Debtors, and the boards of each of the Offshore Debtors formed an independent committee, consisting of Roisin Cater and me with materially the same powers and purpose with respect to the Offshore Debtors' handling of the Delegated Matters as the Agent possessed with respect to the Onshore Debtors' handling of the Delegated Matters.  The Independent Fiduciaries have generally acted in concert in carrying out their responsibilities with respect to the Delegated Matters on behalf of all of the Debtors.

      ii.    *The Investigation*

      22.    In December 2010, Young Conaway Stargatt & Taylor, LLP ("<u>Young Conaway</u>") was engaged to advise the Debtors as to their restructuring options and, later, to assist the Independent Fiduciaries in investigating the claims made in the Louisiana Litigation as well as other potential claims against Commonwealth or Cantor arising from the same operative facts (the "<u>Investigation</u>").  Young Conaway commenced an investigation as to whether Cantor had engaged in any wrongdoing in connection with the formation of the Collybus CDO or entry into the Cantor Settlement Agreement and whether Commonwealth had (1) breached its fiduciary duties to any of the Debtors, (2) breached the LLC Agreements of the Onshore

Debtors, (3) breached any contracts entered into with the Offshore Funds, (4) violated Louisiana law, including Louisiana Blue Sky law and the Louisiana Retirement System Fiduciary law or (5) committed fraud or negligent misrepresentation in connection with (i) Commonwealth's role in the formation of the Collybus CDO, (ii) the Debtors' investments in the Collybus CDO or (iii) Commonwealth's management of the Debtors thereafter.  Additionally, the Independent Fiduciaries observed that potential claims against Commonwealth or Cantor under Federal securities laws or under ERISA may also exist with respect to investors or the Debtors, but did not undertake a further evaluation of the merits of those potential claims.

23.     Young Conaway's investigation occurred between January 6, 2011 and April, 2011.  In the course of the investigation, Young Conaway spoke with five persons associated with Commonwealth, was provided access to approximately 59,000 of Commonwealth's documents, and was given an opportunity to review three transcripts from the SEC investigation.  The issues that were investigated are complex, and Young Conaway was without the benefit of pretrial discovery in the Louisiana Litigation, which has not yet taken place.

iii.     *The Results of Young Conaway's Investigation*

24.     In the course of the investigation, the Independent Fiduciaries and counsel to the Debtors were provided with documents by Commonwealth but were not provided with full access to Commonwealth's records.

25.     Based upon the: (i) limited resources available to the Independent Fiduciaries to fully and completely review all of the relevant information related to the Louisiana Litigation, the Collybus Litigation and the SEC Investigation; and (ii) limited information reviewed by the Independent Fiduciaries during the Investigation, the Independent Fiduciaries

were unable to reach a determination regarding the viability or the value of the Debtors' and the Investors' claims against Commonwealth or the relative strength of the defenses thereto. However, the Independent Fiduciaries were able to conclude that aside from the currently pending claims against Cantor for the return of the $525,000 withheld by Cantor, the Cantor Settlement Agreement's releases could provide strong defenses to certain claims that could be asserted against Cantor.

**F.      Events Leading to these Bankruptcy Cases**

26.      The Collybus CDO and the resulting Collybus Litigation have raised several complex issues for the Debtors.  As an initial matter, the claims asserted in the Derivative Action belong to the Debtors and constitute property of the Debtors' estates.  Accordingly, the Debtors need the ability to evaluate the merits of, and exercise appropriate control over, the Derivative Action and the disposition of the claims asserted therein.  Second, assuming that the plaintiffs and the party asserting indemnification claims against the Debtors arising in and related to the Collybus Litigation prevail, the Collybus Litigation poses a "zero-sum" situation for Investors, because the Debtors may have to pay from their own funds – which would otherwise be distributed to Investors – to satisfy any judgments that Investors may obtain against Commonwealth and Cantor due to potential indemnification claims against the Debtors. However, this situation substantially prejudices returns to Investors after accounting for the extensive costs and expenses that would result from litigating the class and derivative claims asserted in the Louisiana Litigation to judgment.  Finally, in the more than 3 years since the Collybus CDO's formation, the market for the securities issued by the Collybus CDO – which make up substantial portions of the Debtors' assets – has contracted and the market's pricing for these securities has declined drastically.  Against this backdrop, the Independent Fiduciaries have

been advised by Commonwealth that many Investors have increasingly demanded that the Debtors redeem their interests. Immediately satisfying these redemption demands would require the Debtors' to liquidate their holdings in an illiquid market and at depressed prices, to the detriment of Investors that may believe the Collybus CDO securities have intrinsic value not reflected by the market's current pricing of the Collybus CDO securities. Moreover, regardless of the Investors' redemption requests, in light of the indemnification claims asserted by Commonwealth and Cantor, liquidation of the Collybus CDO securities was not possible.

27. In light of the fact that Commonwealth and Mr. Morales are named as defendants in the Collybus Litigation, the Debtors provided the Independent Fiduciaries with authority and oversight over the disposition of the Collybus Litigation and the restructuring process. The Independent Fiduciaries and their professionals have expended considerable time and resources familiarizing themselves with the Debtors, their businesses and the Collybus Litigation (including the claims asserted therein), the potential for additional indemnification claims against the Debtors related to the Collybus Litigation or otherwise that have not yet been asserted formally, residual claims that may arise and the financial stakes posed by the Collybus Litigation. During this process, the Independent Fiduciaries consulted frequently with the Debtors' principals and advisors, as well as Commonwealth and Mr. Morales, each individually and collectively.

28. After careful consideration of the issues facing the Debtors, the Independent Fiduciaries began to pursue a strategy with a two-fold goal: (i) building a consensus among Investors as to the liquidation and monetization of the Debtors' assets, including causes of action held by the Debtors, and (ii) resolving the Collybus Litigation in a cost-effective and expeditious manner. The Independent Fiduciaries identified the key constituencies in these cases

01: 11493813.5                         070177.1001

– Cantor, Commonwealth, Mr. Morales and the Investors – and began the process of negotiating the terms of a consensual restructuring, reorganization or liquidation with Cantor, Commonwealth and Mr. Morales that could be presented to Investors. The Independent Fiduciaries expected that this process would establish the parameters through which the Investors could liquidate or retain the Debtors' investment portfolio and dispose of the various claims pending in, and that may arise from, the Collybus Litigation. The Independent Fiduciaries considered whether such a process could be implemented entirely out of Court or through an administrative or judicial proceeding – including under chapters 7 or 11 of the Bankruptcy Code or under applicable non-bankruptcy law.

29.     The Independent Fiduciaries were able to engage Cantor, Commonwealth and Mr. Morales. The Independent Fiduciaries, Commonwealth and Mr. Morales participated in the development and preparation of the Plan and accompanying disclosure statement (the "Disclosure Statement"). The Independent Fiduciaries and Commonwealth negotiated the terms of the Commonwealth Contribution (as defined in the Plan), and the Independent Fiduciaries and Cantor negotiated the terms of the Cantor Contribution (as defined in the Plan); however, an independent committee of Investors was never formed. In light of these facts, the Independent Fiduciaries concluded that it was appropriate to present the Plan to the Investor-body as a whole so that each Investor could independently evaluate whether it supported the Plan. And then, only if the requisite majority of the Investors in each class support the Plan, would the Debtors commence the Chapter 11 Cases, and pursue Plan confirmation.

**G.      The Plan**

30.     The Plan provides that Allowed Other Priority Claims, Secured Claims and General Unsecured Claims will be paid in full either from cash on hand or through the liquidation of securities held by the Debtors. The Plan further provides that the following

Classes of Claims and Interests are impaired (collectively, the "Impaired Classes"): (i) Class 4 –
Indemnification Claims; (ii) Class 5 – CACFILLC Interests; (iii) Class 6 – CACFILTD Interests;
(iv) Class 7 – CAHYLLC Interests; (v) Class 8 - CAHYLTD Interests; (vi) Class 9 - CASELLC
Interests; (vii) Class 10 - CASELTD Interests; and (viii) Class 11 - SSC3LLC and SSC3LTD
Interests. All of the Impaired Classes were entitled to vote on the Plan, and were required either
to elect to opt into a new, post-confirmation fund that would continue to hold a portion of the
Debtors' securities or elect to receive a cash distribution on account of their interests in the
Debtors.

      31.     The Debtors engaged Epiq Systems, Inc. and Epiq Bankruptcy Solutions,
LLC ("Epiq" or the "Voting Agent") to act as their voting and solicitation agent for purposes of
distributing the Disclosure Statement and Plan ballots and calculating and tabulating votes on the
Plan. On July 22, 2011, the Debtors caused the Voting Agent to commence distribution of
copies of the Disclosure Statement, the Plan, and ballots to each person or entity (or to their
nominee) that was a Holder of a Claim or Interest in one of the Impaired Classes as of July 22,
2011, the voting record date. The Debtors established August 19, 2011, as the deadline by which
completed ballots had to be received by the Voting Agent, although the deadline has been
extended for the plaintiffs in the Louisiana Litigation, MERS, and certain other Investors in
CACFILLC to facilitate settlement discussions (as may have been extended, the "Voting
Deadline"). As of the date hereof, all parties entitled to vote on the Plan were required to have
submitted a ballot.

      32.     As of the Voting Deadline (as may have been extended), all of the
Impaired Classes, with the exception of Class 5, overwhelmingly voted to accept the Plan. The
Debtors, Commonwealth and Cantor, each individually as well as collectively, negotiated over

an extended period of time with those Investors in Class 5 who elected to reject the Plan, and despite their best efforts no resolution was reached.

33.    Pursuant to the terms of the Plan, unless the Plan is accepted by all of the Impaired Classes, Commonwealth and Cantor are not required to make their respective contributions.  Accordingly, because of the impasse the Debtors find themselves at with respect to those dissenting Investors in Class 5, the Debtors are unable to seek prosecution of the Plan at this time, and therefore, the Debtors have determined that it is in the best interests of their Investors to commence these Chapter 11 Cases at this time so that they may further discussions with their investors with the oversight of this Court.

## FIRST DAY PAPERS

34.    On the date hereof, the Debtors have filed various motions and applications (the "<u>First Day Papers</u>")[7] which, if granted, will ease the Debtors' transition into chapter 11 protection and allow the Debtors to continue to maintain their affairs close as possible to "ordinary course" in light of their chapter 11 filings.

**A.    Joint Administration Motion**

35.    The Debtors believe that most if not all of the motions, applications, hearings and orders that will arise in these cases will jointly affect all of the Debtors.  Moreover, each of the Debtors' day-to-day operations are managed and administered, for the most part, on a consolidated basis by Commonwealth and State Street.  Accordingly, it would be most efficient to jointly administer these cases for procedural purposes only.  Specifically, the Debtors request that the Court maintain one file and one docket for all of the Debtors' cases under the case number assigned to Sand Spring Capital III, LLC and also request that an entry be made on the

---

[7] Capitalized terms used describing the First Day Papers shall have the meanings ascribed to such terms in the respective First Day Paper.

dockets of each of the Debtors' cases, other than that of Sand Spring Capital III, LLC, to reflect the joint administration of these cases.

36.     The Debtors believe that joint administration will also significantly reduce the volume of documents that otherwise would be filed with the Clerk of this Court, render the completion of various administrative tasks less costly and minimize the number of unnecessary delays.  Moreover, the Debtors believe that the relief requested by this motion will also simplify supervision of the administrative aspects of these cases by the Office of the United States Trustee.  For these reasons, the Debtors submit that the relief requested in this motion is in the best interests of the Debtors, their estates and their creditors and should therefore be approved.

**B.      Claims and Notice Agent Retention Application**

37.     By this application, the Debtors seek entry of an order authorizing the Debtors to retain Epiq as their claims, solicitation and notice agent ("Claims Agent").  While the Debtors only have a limited number of liquidated and known claims, given the assertions made in the Collybus Litigation, the Investors and other third parties may assert claims against the Debtors based on investments in the Debtors and/or the Collybus Litigation; however, the Debtors reserve the right to contest the validity of such claims and to request that such claims, to the extent valid, be subordinated.  Upon information and belief, Epiq is an experienced claims agent and is frequently used by debtors in large chapter 11 cases, and I believe Epiq is well qualified to serve as Claims Agent in these cases.  Epiq is also familiar with the Debtors through its role in the Debtors' pre-petition solicitation process.  The employment of Epiq will also provide the Debtors with efficient management of the claims and noticing processes in these cases, thereby leaving the Debtors' management and advisors to focus on the Debtors' reorganization efforts.

01: 11493813.5                                                    070177.1001

38.     For these reasons, the Debtors submit, and I believe, that the relief requested in this application is in the best interest of the Debtors, their estates and their creditors, and therefore should be approved.

**C.     Cash Management Motion**

39.     By this motion, the Debtors are requesting authority to continue using their existing Cash Management System, including the grant of any waivers of the UST Guidelines and the requirements under section 345(a) of the Bankruptcy Code, and to authorize the payment of all amounts owed to State Street under the Debtors' custody and administrative service agreements.  The Cash Management System allows the Debtors to efficiently and safely engage in their securities transactions and treasury functions through one integrated platform provided by State Street.  State Street is a reputable bank with an extensive history of providing banking, custody and trust services.  The Debtors believe that it is appropriate and in the best interest of their estates to allow the Debtors to continue to maintain their Cash Management System.  The Debtors' failure to obtain approval to continue the Cash Management System in its current form would disrupt the Debtors' operations and would likely result in increased costs if the Debtors had to find suitable replacements for the several services that State Street provides to the Debtors.  Accordingly, the Debtors submit that they should be authorized to continue to use their Cash Management System.

40.     In addition, the Debtors seek an interim waiver of the investment requirements under section 345(a) of the Bankruptcy Code, without prejudice to the Debtors' right to seek a final waiver.  All of the Debtors' cash is kept in accounts maintained with State Street.  State Street is a reputable bank, and the Debtors believe that the integrity of their cash investments will not be placed at risk if they are maintained at State Street during the duration of these cases.  Further, the Debtors will use their reasonable efforts to bring State Street into

compliance with the requirements of section 345(a) of the Bankruptcy Code by requesting that State Street execute a uniform depository agreement with the US Trustee's office the execution of which, however, shall not be a condition to maintaining the Cash Management System. As set forth above, maintaining the Cash Management System – including the bank accounts at State Street – is appropriate and in the best interest of the Debtors and their estates, and therefore, I believe cause exists to grant the interim waiver of the requirements of section 345(a) of the Bankruptcy Code.

41. Finally, the Debtors are requesting that they be granted authorization to honor all amounts owing to State Street as of the Petition Date, without regard to the date upon which those amounts accrued or come due. State Street is essential to the Debtors' operations, and any cessation in the services State Street provides to the Debtors due to non-payment would likely result in disruption to the Debtors' business and harm to the success of the Chapter 11 Cases. As the custodian of the Debtors' current financial records, State Street will be called upon in the early stages of these cases as the US Trustee and any official committee appointed in these cases seek to perform due diligence on the Debtors and their businesses. As a result, State Street will be essential both to the Debtors' transition into chapter 11 and the operation of the Debtors' businesses throughout these cases. Finally, I believe that all creditors of the Debtors (other than parties holding claims that may be voluntary compromised) will be paid in full, and payment of State Street at this time will only affect the timing of payment. Accordingly, I believe that it is appropriate and in the best interest of the Debtors and their estates to authorize the Debtors to make payments to State Street arising under the ASA and CSA.

## CONCLUSION

42.	In conclusion, for the reasons stated herein and in each of the First Day Papers filed concurrently or in connection with the commencement of these cases, I respectfully request that each of the First Day Papers be granted in its entirety, together with such other and further relief as this Court deems just and proper.

Dated:	New York, New York
	October 24, 2011

	_/s/ Hobart G. Truesdell_
	Hobart G. Truesdell