IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>SAND SPRING CAPITAL III, LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 11-13393 (BLS)<br><br>(Jointly Administered) |
| SAND SPRING CAPITAL III, LLC, *et al.*,<br><br>Plaintiffs,<br><br>-vs-<br><br>JOSEPH N. BROYLES, *et al.*, AS REPRESENTATIVES OF CA HIGH YIELD FUND, LLC; CA HIGH YIELD OFFSHORE FUND, LTD.; CA CORE FIXED INCOME FUND, LLC; CA CORE FIXED INCOME OFFSHORE FUND, LTD.; CA STRATEGIC EQUITY FUND, LLC; AND CA STRATEGIC EQUITY OFFSHORE FUND, LTD.<br><br>Defendants. | Adversary Proceeding No. _____ |

**DEBTORS' COMPLAINT FOR**
<u>**INJUNCTIVE AND DECLARATORY RELIEF**</u>

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number (if applicable), are CA Core Fixed Income Fund, LLC (7053) (Case No. 11-13394 (BLS)); CA Core Fixed Income Offshore Fund, Ltd. a/k/a CA Core Fixed Income Fund, Ltd. (N/A) (Case No. 11-13396 (BLS)); CA High Yield Fund, LLC (7155) (Case No. 11-13397 (BLS)); CA High Yield Offshore Fund, Ltd. a/k/a CA High Yield Fund, Ltd. (N/A) (Case No. 11-13400 (BLS)); CA Strategic Equity Fund, LLC (7141) (Case No. 11-13401 (BLS)); CA Strategic Equity Offshore Fund, Ltd. (N/A) (Case No. 11-13402 (BLS)); Sand Spring Capital III, LLC (9691) (Case No. 11-13393 (BLS)); Sand Spring Capital III, Ltd. (N/A) (Case No. 11-13403 (BLS)); and Sand Spring Capital III Master Fund, LLC (4004) (Case No. 11-13404 (BLS)). The address for each of the Debtors is 315 Third Street, Baton Rouge, Louisiana 70801.

01: 11838332.8

Plaintiffs, debtors and debtors in possession in the above-captioned bankruptcy cases ("Plaintiffs" or "Debtors"), for their Complaint for Injunctive and Declaratory Relief against the above-captioned defendants, state as follows:

## SUMMARY OF THE ACTION[2]

1. This adversary proceeding is brought to enjoin the prosecution of an action (as defined in greater detail below, the "Louisiana Litigation") currently pending in the United States District Court for the Middle District of Louisiana against, among others, Cantor Fitzgerald & Co. ("Cantor"), Commonwealth Advisors, Inc. ("Commonwealth"), and Walter Morales ("Morales", and together, with Cantor and Commonwealth, the "Louisiana Litigation Defendants"). As described more fully below, the plaintiffs in the Louisiana Litigation allege, among other things, mismanagement, fraud, violations of Louisiana Blue Sky law, breach of fiduciary duty and failure to disclose material facts. The Louisiana Litigation arises out of the creation, structuring, management, placement, sale, and/or valuation of, as well as other transactions relating to, a collateralized debt obligation (as described in greater detail below, "Collybus"), as well as the alleged tortious acts surrounding the sale of securities to the Debtors' investors (as described in greater detail below, the "Investors"), and the alleged mismanagement of the Debtors. Prosecution of the Louisiana Litigation may preclude the Debtors from effectively prosecuting certain claims which represent property of their estates.

2. In this action, the Debtors seek, pursuant to 11 U.S.C. § 362(c)(1), to extend the automatic stay to encompass the Louisiana Litigation because the Debtors are the real parties in interest in that action and further prosecution of the Louisiana Litigation threatens the Debtors' property interests by (a) potentially causing collateral estoppel; (b) possibly requiring

---

[2] Capitalized terms used but not otherwise defined in the summary shall have the meaning ascribed to such terms in the body of the complaint.

the Debtors to advance or indemnify the litigation expenses of the Louisiana Litigation Defendants; (c) dissipating the limited assets of the bankruptcy estates, jeopardizing the success of a reorganization plan and infringing on the rights of the 90% of the Debtors' investors who supported the settlement of these claims as set forth in the Debtors' prepackaged plan of reorganization; and (d) interfering with the Debtors' ability to implement a plan of reorganization.

3. Additionally, the Debtors seek an injunction pursuant to 11 U.S.C. § 105(a) and Bankruptcy Rule 7065 to prevent the prosecution of the Louisiana Litigation against the Louisiana Litigation Defendants. Finally, the Debtors seek a declaration that the claims raised in the Louisiana Litigation are the property of the Debtors' estates, and may only be asserted by the Debtors directly.

## JURISDICTION AND VENUE

4. On October 25, 2011 (the "Petition Date"), each of the Debtors filed a petition with this Court under chapter 11 of the Bankruptcy Code, thereby commencing these chapter 11 cases (collectively, the "Chapter 11 Cases"). The Debtors are operating their businesses and managing their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in the Chapter 11 Cases, and no committees have been appointed or designated.

5. Pursuant to 28 U.S.C. §§ 157 and 1334, the Court has jurisdiction over this matter. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

6. Venue of this proceeding in the District of Delaware is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

01: 11838332.8

7.    This action is brought in accordance with Rule 7001 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"). There exists a substantial controversy between Plaintiffs and Defendants of sufficient immediacy and reality to warrant the relief requested.

## THE PARTIES

**A.    Plaintiffs**

8.    CA Core Fixed Income Offshore Fund, Ltd. is a Cayman Islands exempted company. Its principal place of business is 315 Third Street, Baton Rouge, Louisiana.

9.    CA Core Fixed Income Fund, LLC is a Delaware limited liability company. Its principal place of business is 315 Third Street, Baton Rouge, Louisiana.

10.    CA High Yield Fund, LLC is a Delaware limited liability company. Its principal place of business is 315 Third Street, Baton Rouge, Louisiana.

11.    CA High Yield Offshore Fund, Ltd. is a Cayman Islands exempted company. Its principal place of business is 315 Third Street, Baton Rouge, Louisiana.

12.    CA Strategic Equity Fund, LLC is a Delaware limited liability company. Its principal place of business is 315 Third Street, Baton Rouge, Louisiana.

13.    CA Strategic Equity Offshore Fund, Ltd. is a Cayman Islands exempted company. Its principal place of business is 315 Third Street, Baton Rouge, Louisiana.

14.    Sand Spring Capital III, Ltd. is a Cayman Islands exempted company. Its principal place of business is 315 Third Street, Baton Rouge, Louisiana.

15.    Sand Spring Capital III, LLC is a Delaware limited liability company. Its principal place of business is 315 Third Street, Baton Rouge, Louisiana.

16. Sand Spring Capital III Master Fund, LLC is a Delaware limited liability company. Its principal place of business is 315 Third Street, Baton Rouge, Louisiana.

**B.     Defendants**

17. Joseph N. Broyles, an individual residing and domiciled in the State of Louisiana, Parish of East Baton Rouge.

18. M. Badi Asbahi, an individual residing and domiciled in the State of Louisiana, Parish of Livingston.

19. Preston Cloyd, an individual residing and domiciled in the State of Louisiana, Parish of Lafayette.

20. Steven Collins and Eileen Collins, husband and wife, residing and domiciled in the State of Louisiana, Parish of East Baton Rouge.

21. Charles and Anne Richey, husband and wife, residing and domiciled in the State of Louisiana, Parish of Sabine.

22. Susan B. Beninati, residing and domiciled in the State of Louisiana, Parish of Orleans.

23. Russ P. Barranco, residing and domiciled in the State of Louisiana, Parish of Orleans.

24. Janice B. Virgadamo, residing and domiciled in the State of Louisiana, Parish of Jefferson.

25. Jody A. Barranco, residing and domiciled in the State of Louisiana, Parish of Jefferson.

26. Karen L. Barranco, residing and domiciled in the State of California, County of Los Angeles.

27. Municipal Employee's Retirement System of Louisiana ("MERS") is a statutorily chartered government entity with the powers and privileges of a corporation, including the power to sue and be sued in its own name. MERS is an arm of the State of Louisiana, managed by a Board of Trustees, whose members are appointed pursuant to Louisiana law. MERS' principal place of business is in the Parish of East Baton Rouge, State of Louisiana.

28. The Registrar of Voters Employee Retirement System ("ROVERS") is a statutorily chartered government entity with the powers and privileges of a corporation, including the power to sue and be sued in its own name. ROVERS is an arm of the State of Louisiana, managed by a Board of Trustees, whose members are appointed pursuant to Louisiana law. ROVERS' principal place of business is in the Parish of East Baton Rouge, State of Louisiana.

29. The Firefighters' Retirement System ("Firefighters") is responsible for overseeing the Pension Funds of Louisiana Firefighters. Firefighters' principal place of business is in the Parish of East Baton Rouge, State of Louisiana.

### C.    The Louisiana Litigation Defendants

30. Commonwealth is a registered investment advisor and Louisiana corporation, registered under the Investment Advisors' Act of 1940, with a registered office located at 315 Third Street, Baton Rouge, Louisiana, 70801. Commonwealth serves as the managing member of the Debtors that are Delaware limited liability companies, and the investment advisor of the Debtors that are Cayman Islands exempted companies.

31. Morales is an individual domiciled and residing in the State of Louisiana. Morales is the founder, President, Managing Partner, and Chief Investment Officer of

Commonwealth. Morales is the director of the Debtors that are Cayman Islands exempted companies.

32.   Cantor is a New York partnership, registered as a FINRA broker-dealer, with its principal place of business at 110 East 59th Street, New York, New York 10022.

## FACTUAL BACKGROUND

**A.   Overview of the Debtors, and their Relationship with Commonwealth and Cantor**

33.   The Debtors are all investment vehicles that hold securities and other assets for investment purposes for the benefit of their membership interest holders – the Investors. The first investments in the Debtors were made in early 2006 and at present, the Debtors have approximately 216 Investors across the various funds.

34.   Since the Debtors' formation, their investment strategies and operations have been managed by Commonwealth. Commonwealth serves as managing member or investment advisor of each of the Debtors, and in such role, has the authority to implement the Debtors' investment strategies. Pursuant to the governing documents and investment advisory agreements with Commonwealth, Commonwealth charges each of the Debtors a management fee ranging from .06 to 2.0 percent on assets per annum in exchange for its services.

35.   In 2007, shortly after their formation, each Debtor was heavily invested in mortgage-backed securities ("MBS"). Unfortunately for the Investors, this period coincided with the beginning of a substantial decline in the market for MBS, which led to decreases in the performance, liquidity, market value, and ratings of the MBS owned by the Debtors. As a consequence, Commonwealth began to explore the possibility of resecuritization of the Debtors' investments in MBS. Around this time, Cantor had been acting as a broker for the Funds.

01: 11838332.8

i.  <u>Collybus</u>

36.  The Collybus CDO (collateralized debt obligation) consists of six tranches of notes ("<u>Notes</u>") co-issued by Collybus CDO I Ltd.[3] and Collybus CDO I Corp.[4] (jointly, "<u>Co-Issuers</u>") and a tranche of subordinated securities ("<u>Subordinated Securities</u>") issued by Collybus CDO I Ltd. The Co-Issuers were formed by Cantor to acquire assets, consisting predominantly of MBS, held by Cantor, the Debtors, other investors whose accounts were managed by Commonwealth, Waterfall Eden Master Fund, Ltd. ("<u>Waterfall</u>"), and Niagara (collectively the "<u>Participating Entities</u>") and then to issue the Notes and Subordinated Securities, backed by the Collateral, to the Participating Entities in exchange for the MBS and cash contributed to Collybus by the Participating Entities.

37.  Cantor and Commonwealth began discussing the formation of the Collybus in June 2007. Around that time, Commonwealth agreed that MBS owned by Commonwealth's clients, including certain of the Debtors, would be contributed to the Co-Issuers. In turn, Cantor agreed to contribute approximately $600 million in MBS that it held and approximately $60 million cash to the Co-Issuers. Ultimately, in November 2007, certain of the Debtors contributed MBS assets to the Collybus, and received (along with other clients of Commonwealth) $100 million in cash plus the C and D tranches of the Notes.

38.  By the end of the first quarter of 2008, Collybus had failed overcollateralization triggers with respect to the C and D tranches of the Notes, which caused all cash flow to be diverted to principal and interest on the more senior notes, until such time as the coverage ratio recovered. In April 2008, due to changes in assumptions, rating agencies lowered

---

[3] Collybus CDO I Ltd. is an exempted company incorporated with limited liability under the laws of the Cayman Islands on September 26, 2007.
[4] Collybus CDO I Corp. is a Delaware corporation, incorporated on September 27, 2007.

their ratings of the C and D tranches of the Notes[5] slightly, but nevertheless still rated them investment grade. By mid-June 2008, however, the C and D tranches of Notes were placed on negative watch by the rating agencies. In the fall of 2008, both the C and D tranches of Notes defaulted on their interest obligations and lost their investment grade ratings. Thereafter, all of Collybus's cash flow was allocated to payment of principal and interest on the A2 tranches of Notes and to interest on the A3 and B tranches of Notes.

39.    The A1 Notes were paid in full during the first quarter of 2008, leaving the A2 Notes the senior tranche. After the creation of Collybus, Commonwealth began to consider the Debtors' purchase of the A2 tranche of the Notes. Commonwealth has stated that it considered purchasing the A2 tranche for several reasons. First, Commonwealth believed that the holders of the A2 Notes would realize significantly all of the value of the collateral securities underlying the Collybus if cash flows later proved to be insufficient to pay all principal and interest due under the subordinated securities issued by Collybus. Second, the holders of the A2 Notes were able to exercise a blocking position with respect to the disposition of the collateral securing Collybus, which could influence the potential returns to the holders of the subordinated tranches, including the C and D Notes and the equity piece. Third, Commonwealth believed that the holders of the A2 Notes could obtain additional value if, in the future and if deemed appropriate, the underlying collateral securing Collybus was "broken out" and sold separately. In June 2008, the Debtors purchased from Cantor all of the A2 Notes, which had a face value of $610.5 million, at a discounted price of $72.75 per $100 par value.[6]

40.    Cantor provided financing for approximately $300 million of the $400+ million purchase price for the A2 Notes. The financing was governed by a certain master

---

[5] For example, S&P lowered its rating of the Collybus D tranche bonds from BBB+ to BBB-, and the C tranche bonds from A+ to A.

[6] The A3 Notes were acquired non-Debtors,

9

repurchase agreement dated as of March 28, 2007 between Cantor, Commonwealth and the Debtors (with all amendments, supplements and related confirmations and corrections, the "Cantor Repo") by which Cantor agreed to buy the just-acquired A2 Notes from the Debtors and the Debtors agreed to repurchase the A2 Notes from Cantor at that same purchase price (adjusted upwards for an amount constituting a return to Cantor on the amount of the purchase price) at a point in the future. Having arranged for the Cantor Repo, the Debtors were able to acquire the A2 Notes for an immediate payment of $101,138,702.84 inclusive of accrued interest.

    ii.    The Cantor Settlement

    41.    On November 6, 2008, Commonwealth brought an arbitration proceeding on behalf of the Debtors before the Financial Industry Regulatory Authority ("FINRA") that was intended to resolve a dispute concerning Cantor and Commonwealth's interpretations of the Cantor Repo. Additionally, on January 8, 2009, Commonwealth filed an action against Cantor in Louisiana state court on behalf of the Debtors seeking a temporary restraining order, preliminary and permanent injunctions and a declaratory judgment directed towards: 1) preventing Cantor from making margin calls on the Debtors or declaring an event of default under the Cantor Repo while the arbitration before FINRA was ongoing; or 2) obtaining a declaration that the dispute between Cantor, Commonwealth and the Debtors, which were the subject of the FINRA arbitration, must proceed to arbitration in due course.

    42.    Ultimately, Commonwealth caused the Debtors to enter into a settlement agreement with Cantor effective as of January 9, 2009 (the "Cantor Settlement Agreement"). The Cantor Settlement Agreement provided that (i) the confirmation under the Cantor Repo would be amended to delay the repurchase date under the Cantor Repo and to explicitly require the application of principal payments made on the A2 Notes to the amount owed by the Debtors

01: 11838332.8

under the Cantor Repo, (ii) the margin call provisions would be amended, (iii) Cantor would receive a prompt payment of $5 million, to be applied to the Debtors' repurchase obligations under the Cantor Repo, and (iv) Commonwealth and the Debtors would provide Cantor with a broad release of claims and agree to indemnify Cantor for certain causes of action related to the purchase and financing of the A2 Notes.

43. In the later part of 2010, Commonwealth directed the Collybus trustee to liquidate certain of the collateral securities in Collybus in order pay the amount of the Debtors' repurchase obligation. Cantor retained approximately $525,000 from the cash flow from Collybus and allegedly applied those funds to the Debtors' indemnification obligations in favor of Cantor under the Cantor Settlement Agreement.

B. **The Louisiana Litigation**

44. On September 15, 2010, Joseph Broyles ("Broyles") brought a putative class action suit in the 19th Judicial District Court for the Parish of East Baton Rouge in the state of Louisiana (the "Class Action") against the Louisiana Litigation Defendants. In the Class Action complaint, a copy of which is attached hereto as **Exhibit 1** (the "Class Action Complaint"), Broyles asserts that the Investors "invested in one or more pooled-asset funds [the Debtors], created and managed by Commonwealth, which hold portions of the [Collybus]." Class Action Complaint ¶ 3. He seeks to recover damages on behalf of all of the Investors based on losses sustained by the Debtors as a result of the Collybus transactions. Id. ¶¶ 49, 95.2. The Class Action Complaint alleges that every putative class member suffered financial losses "through their investments with Commonwealth in the Debtors." Id. ¶ 10.

45. On November 3, 2010, Broyles and two other individual Investors brought a derivative and class action in the 19th Judicial District Court for the Parish of East Baton

01: 11838332.8

Rouge in the State of Louisiana (the "Derivative Action") against, among others, the Louisiana Litigation Defendants. Certain of the Debtors were named as nominal plaintiffs and derivative defendants in the Derivative Action. The Derivative Action complaint, a copy of which is attached hereto as **Exhibit 2** (the "Derivative Action Complaint"), asserts class claims and derivative claims on behalf of the Debtors that are virtually identical to those alleged in the Class Action. Like the Class Action, the Derivative Action addresses alleged injuries suffered by the Debtors as a result of the Collybus transactions. The Derivative Action plaintiffs commenced the Derivative Action in "in their particular capacities as members and/or shareholders of" the Debtors. Derivative Action Complaint at 1. The Derivative Action seeks "to enforce all rights and actions of the [Debtors] against the named defendants in connection with the sale of [Collybus], a collateralized debt obligation, or CDO." Id. ¶ 1. It alleges that the Debtors "were significantly harmed by these transactions" and have "sustain[ed] hundreds of millions of dollars in losses." Id. ¶¶ 1, 5.

46. Cantor removed the Class and Derivative Actions (jointly, the "Louisiana Litigation") to the United States District Court for the Middle District of Louisiana (the "District Court") on December 22, 2010.

47. On January 19, 2011, Cantor filed a motion to dismiss. Louisiana Litigation Dkt. No. 15. Cantor asserted, among other things, that Broyles lacks standing because all of his claims against the Louisiana Litigation Defendants are derivative claims that must be brought on behalf of the Debtors. On January 21, 2011, Broyles filed a motion to remand (the "Motion to Remand"). Louisiana Litigation Dkt. No. 18.

48. On January 25, 2011, the District Court entered an Order denying the motion to dismiss without prejudice pending its decision on the Motion to Remand, Louisiana

Litigation Dkt. No. 27, and, on January 28, 2011, the District Court entered an Order consolidating the Louisiana Litigation, Louisiana Litigation Dkt. No. 28.

49. On October 5, 2011, the District Court denied the Motion to Remand. Louisiana Litigation Dkt. No. 58.

50. On November 4, 2011, Defendants filed an amended Class Action Complaint without seeking leave to do so. Louisiana Litigation Dkt. No. 59. After Cantor objected to the filing of the amended Class Action Complaint without a motion for leave, Broyles filed a motion to withdraw the amended Class Action Complaint and for leave to file the First Amended Class Action Complaint, a copy of which is attached hereto as **Exhibit 3** ("First Amended Class Action Complaint"). Louisiana Litigation Dkt. No. 60. Broyles asserts that "the amended allegations . . . arise out of the same transactions that underlie the allegations in Broyles' original Petition." *Id.* at 3. Broyles admits that "the proposed amended allegations are substantially similar to the allegations in the original Petition and simply remove all class allegations and add additional plaintiffs." *Id.*

51. The parties to the Louisiana Litigation entered into an agreement to stay all proceedings from November 5, 2011 through February 3, 2012. And, on December 8, 2011, the District Court ordered that the Louisiana Litigation remain administratively closed pending the outcome of the Chapter 11 Cases. Louisiana Litigation Dkt. No. 61.

52. On February 6, 2012, the Defendants filed a motion to reopen the Louisiana Litigation, Louisiana Litigation Dkt. No. 62, and a second motion for leave to amend, Louisiana Litigation Dkt. No. 63 (the "Second Motion for Leave"). Attached to the Second Motion for Leave was a proposed Second Amended and Restated Class Action Complaint, a copy of which is attached hereto as **Exhibit 4** (the "Second Amended Class Action Complaint").

13

01: 11838332.8

*See* Louisiana Litigation Dkt. No. 63. Like the First Amended Class Action Complaint, the Second Amended Class Action Complaint arises from the same events as the original Class Action Complaint. It eliminates the class allegations from the First Amended Class Action Complaint and seeks to add eleven individuals and three state pension funds as plaintiffs.

53. On March 1, 2012, Cantor filed its opposition to the Second Motion for Leave. Louisiana Litigation Dkt. No. 65. Cantor asserted, among other things, that Defendants lack standing because all of his claims against the defendants in the Louisiana Litigation are derivative claims that must be brought on behalf of the Debtors. The Defendants have filed a response in support of the Second Motion for Leave.

C. **The Debtors' Indemnification Obligations**

54. Pursuant to their Limited Liability Company Operating Agreements, each of CA Core Fixed Income Fund, LLC, CA High Yield Fund, LLC, CA Strategic Equity Fund, LLC, Sand Spring Capital III, LLC, and Sand Spring Capital III Master Fund, LLC is obligated to indemnify Commonwealth and Morales for litigation expenses under certain circumstances.

55. Pursuant to the Investment Advisory Agreements between each of CA Core Fixed Income Offshore Fund, Ltd., CA High Yield Offshore Fund, Ltd., CA Strategic Equity Offshore Fund, Ltd., and Sand Spring Capital III, Ltd., these Debtors are obligated to indemnify Commonwealth and Morales for litigation expenses under certain circumstances.

56. Morales and Commonwealth have claimed indemnification from all of the Debtors for legal expenses related to the Louisiana Litigation. Although the Debtors purchased Directors and Officers Insurance ("D&O Insurance") to alleviate the cost of any potential obligation to indemnify Morales and Commonwealth, the D&O Insurance for the timeframe in question has been completely exhausted.

14

57. Pursuant to the Cantor Settlement Agreement, the Debtors are obligated to indemnify Cantor for its litigation expenses under certain circumstances.

58. In addition to withholding property of the Debtors, as described above, Cantor has brought a lawsuit against the Debtors in the Supreme Court of the state of New York, seeking indemnification for its legal expenses arising out of the Louisiana Litigation. This litigation is currently stayed because of the Chapter 11 Cases.

59. Although the Debtors deny that they have any indemnification obligations, if the Louisiana Litigation is not enjoined, the Debtors may be obligated to indemnify the Louisiana Defendants for some or all of their legal expenses in defending against the Louisiana Litigation.

## Count I

### (Enjoin Defendants From Prosecuting Louisiana Litigation)

60. The Debtors repeat and reallege the allegations in paragraphs 1 through 59, as though fully set forth herein.

61. Under Sections 105(a) and 362 of the Bankruptcy Code, the Court may extend the automatic stay to claims against non-debtors and enjoin prosecution of claims against non-debtors where, among other things, (a) prosecution of a claim against the non-debtor may preclude or interfere with the debtor, itself, prosecuting a direct claim, (b) prosecution of the non-debtor will expose the debtor to a risk of collateral estoppel, (c) the debtor may be obligated to indemnify or advance litigation costs to non-debtor defendants, or (d) claims which could be brought against the debtor and those pending against non-debtors are inextricably intertwined. All four of these bases are present here.

15

62. All of the claims asserted in the Louisiana Litigation are based on harm sustained by the Debtors. The claims seek redress for alleged harm to the Debtors arising out of the Collybus transaction, tortious acts surrounding the Investors' investment in the Debtors, and mismanagement of the Debtors' investments. To the extent any of these claims are proven, all of the Investors will be entitled to share in any benefit in proportion to or indirectly through their investment in the Debtors. Accordingly, the claims asserted in the Louisiana Litigation are derivative and belong in the first instance to the Debtors. Prosecution of these claims by the Defendants will interfere with the Debtors' own rights to pursue claims against any of the Louisiana Litigation Defendants and could put the Debtors at risk of being collaterally estopped from seeking appropriate remedies.

63. Although the Debtors have disputed the scope and applicability of their indemnification obligations to the Louisiana Litigation Defendants, the Debtors may be obligated to indemnify or advance the Louisiana Litigation Defendants' litigation expenses under one or more of the contracts between the Debtors and the Louisiana Litigation Defendants. The Debtor's D&O Insurance has been exhausted, exposing the Debtors to the full cost of any such indemnification.

64. Although Defendants have not asserted claims against the Debtors in the Louisiana Litigation, they have alleged that they were injured by conduct undertaken by Commonwealth on behalf of the Debtors. This suggests that claims that could be brought against the Debtors may exist and would be inextricably intertwined with the claims against the Louisiana Litigation Defendants.

65. The relative harm suffered by the Defendants from an injunction preventing their ability to prosecute the Louisiana Litigation is clearly outweighed by the harm

01: 11838332.8

faced by the Debtors if their reorganization is jeopardized by the ongoing prosecution of the claims against the Louisiana Litigation Defendants.

66. The public interest would be served by an injunction in that such an injunction would promote a successful reorganization of the Debtors and effectuate the purpose of section 362(a).

### Count II

### (Declaration That Claims Asserted In The Louisiana Litigation Belong To The Debtors)

67. The Debtors repeat and reallege the allegations in paragraphs 1 through 59, as though fully set forth herein.

68. The claims asserted in the Louisiana Litigation all allege damages arising out of injuries incurred by the Debtors based on the Debtors' purchases of Collybus, tortious acts surrounding the sale of securities to the Investors, and mismanagement of the Debtors' investments. These claims are common to all Investors and to the Debtors generally. To the extent that they were harmed, the Investors were all harmed and would all recover *pro rata* in proportion to with their investment in the Debtors. Accordingly, the claims asserted are derivative and belong to the Debtors. Absent a showing of demand excusal or demand refusal by the Defendants, which has not been made, only the Debtors may pursue these claims.

69. The Debtors are entitled to a declaration that Defendants' claims are claims that belong to the Debtors, and only the Debtors may pursue these claims.

01: 11838332.8

## Prayer For Relief

WHEREFORE, the Debtors seek judgment:

      A.      Issuing an injunction enjoining Defendants from prosecuting the Louisiana Litigation;

      B.      Extending the automatic stay required by 11 U.S.C. § 362(a)(3) or 11 U.S.C. § 105(a) to encompass the Louisiana Litigation;

      C.      Declaring that the claims raised in the Louisiana Litigation are derivative, belong to the Debtors, and only the Debtors may assert them; and

      D.      Granting such other and further legal and equitable relief as the Court deems just and proper.

Dated: Wilmington, Delaware  
       April 5, 2012

YOUNG CONAWAY STARGATT & TAYLOR, LLP

     /s/ Kenneth J. Enos  
John T. Dorsey (No. 2988)  
Michael R. Nestor (No. 3526)  
Kenneth J. Enos (No. 4544)  
Emily V. Burton (No. 5142)  
Rodney Square  
1000 North King Street  
Wilmington, Delaware 19801  
Telephone: (302) 571-6600  
Facsimile: (302) 571-1253

*Counsel for the Debtors and Debtors-in-Possession*

01: 11838332.8